UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| BH MEDIA GROUP, INC. d/b/a *RICHMOND TIMES-DISPATCH*; GUARDIAN NEWS & MEDIA LLC; THE ASSOCIATED PRESS; and GANNETT CO., INC., <br><br> Plaintiffs, <br><br> v. <br><br> HAROLD W. CLARKE, in his official capacity as Director of the Virginia Department of Corrections, <br><br> Defendant. | Case No. 3:19cv692 |

# COMPLAINT

Plaintiffs, BH Media Group, Inc., The Associated Press, Guardian News and Media, LLC, and Gannett Co., Inc., by counsel, for their Complaint against Harold W. Clarke, in his official capacity as Director of the Virginia Department of Corrections, state as follows:

1. Plaintiffs are news organizations that bring this action pursuant to 42 U.S.C. § 1983 to vindicate the public's right, through their representatives in the press, to witness the entirety of executions conducted by the Virginia Department of Corrections, an agency and instrumentality of the Commonwealth of Virginia.

2. The First Amendment to the Constitution of the United States guarantees the public an affirmative right of access to certain government proceedings, including a right to witness the entirety of executions carried out by the government.

3.      The public's right to witness the entirety of executions includes observation of those initial procedures that are integral to or inextricably intertwined with the execution process.

4.      The Virginia Department of Corrections's current Execution Manual, promulgated in February 2017, provides for citizens and members of the media to witness executions from a witness room separated from the execution chamber by a window. Provisions in the Execution Manual prevent access to the entire execution process by mandating that curtains obstruct witnesses from viewing critical steps in the execution process. One curtain ("front curtain") covers the observation window before an inmate enters the execution chamber. For lethal injections, the Execution Manual mandates that the front curtain remains closed until after prison officials have strapped down the inmate and inserted the intravenous ("IV") lines that will deliver lethal drugs. A second curtain ("back curtain") also shields the executioner and the administration of drugs from view during the entirety of the lethal injection execution. For electrocutions, the Execution Manual requires the front curtain remain closed until prison officials have strapped the inmate to the electric chair and performed three actions unknown to the public because they have been redacted from the publicly available version of the Execution Manual.

5.      As a result of the Virginia Department of Corrections's adherence to the restrictions in the Execution Manual, the public is unable to observe crucial steps in the execution process. The public cannot inspect the initial condition of inmates as they walk in, or the manner in which inmates are strapped to the gurney or chair. For lethal injections, the front curtain obstructs the public from monitoring how the IV lines are placed, how many times execution personnel attempt to place IV lines, how long it takes execution personnel to place IV lines, and whether the inmate experiences pain during this process. Additionally, the back

curtain obstructs witnesses from seeing how and when the different drugs used to sedate and kill the inmate are injected into the IV lines.  For electrocutions, the front curtain prevents the public from viewing the prescribed, redacted procedures, monitoring whether those procedures are followed, and evaluating the effects of those procedures on the inmate.  By concealing these key procedures behind curtains, the Virginia Department of Corrections violates the public's First Amendment right of access to view the entirety of executions.

## JURISDICTION AND VENUE

6.    This action is brought pursuant to 42 U.S.C. § 1983 to vindicate rights that arise under the Constitution of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 and 1343(a)(3).

7.    This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

8.    Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391(b).  Defendant is sued in his official capacity and his official place of business is located within the Richmond Division of this judicial district.  The events giving rise to this Complaint are part of an unconstitutional state policy, practice, or custom engaged in by the Commonwealth of Virginia through Defendant.

## PARTIES

9.    Plaintiff BH Media Group, Inc. publishes the *Richmond Times-Dispatch*, the primary daily newspaper in the City of Richmond, Virginia and the newspaper of record for the Commonwealth of Virginia.  The *Richmond Times-Dispatch* began publishing as the *Richmond Compiler* in 1815 and merged with other newspapers to form the *Times-Dispatch* in 1903.  The *Richmond Times-Dispatch* and its predecessors have reported regularly on executions in Virginia

3

over the past century.  Reporters from the *Richmond Times-Dispatch* have been present at dozens of executions in Virginia since the death penalty was reinstated in 1975.  A *Times-Dispatch* reporter observed  Virginia's most recent executions of Ricky Gray in January 2017 and William Morva in July 2017.  Morva was executed pursuant to the protocols in the current Execution Manual.

10. Plaintiff The Associated Press ("AP") is a nonprofit news cooperative incorporated and based in the State of New York.  The AP is this nation's oldest and largest news organization, serving as a source of news, photographs, graphics, audio, and video for more than one billion people per day.  The AP operates three bureaus in Virginia, located in the Cities of Richmond, Falls Church, and Norfolk, and provides news and content to radio stations, television stations, and newspapers located throughout Virginia.  The AP reports extensively on the death penalty, and its reporters regularly witness executions as surrogates for the public.  An AP reporter also covered Virginia's execution of William Morva in July 2017.

11. Plaintiff Guardian US is a digital news service organized as Guardian News and Media LLC in the State of New York, where it is based.  It was established in 2011 by the London-based newspaper *The Guardian*, one of Britain's oldest and most respected news outlets, to cover domestic and international news for an American audience.  Guardian US produces news articles, opinion, live-blogs, and interactive and multimedia content that currently reaches 47 million online U.S. readers each month.  Guardian US has reported extensively on the death penalty, including Virginia's use of a controversial lethal injection formula and its executions of Ricky Gray and William Morva.

12. Plaintiff Gannett Co., Inc. is currently the sole owner of Multimedia, Inc., a private company that publishes *The News Leader*, the primary daily newspaper for the Cities of

Staunton and Waynesboro, and Augusta County, Virginia. *The News Leader* has covered events in the central Shenandoah Valley region since 1904. The newspaper has reported extensively on the death penalty and the condemned, often attending executions and relaying its reporters' observations and experiences to the public, as it did with the execution of William Morva.

13. Defendant Harold W. Clarke is the Director of the Virginia Department of Corrections ("VDOC") and is sued in his official capacity. Pursuant to Sections 53.1-234 through 53.1-236 of the Code of Virginia, VDOC promulgates and controls Virginia's lethal injection execution procedures. It has authority to change Virginia's current Execution Manual in order to permit witnesses to view the entirety of Virginia's executions.

## FACTUAL BACKGROUND

### A. Virginia Adopts Lethal Injection and Electrocution as Its Methods of Execution

14. Before 1908 the Commonwealth of Virginia conducted executions by public hanging. Indeed, the law required the officer executing the sentence to request the presence of twelve citizens. *See* George W. Munford, Compiler. *Third Edition of the Code of Virginia: Including Legislation to January 1, 1874*, Tit. 55 Ch. 205, 1251-52 (1873).

15. In 1902, for example, Virginia executed George Robinson by public hanging in front of a crowd of three to four thousand onlookers. Robinson was hanged twice in the span of fifteen minutes During the first attempt, the rope snapped in half, causing a bloody laceration to Robinson's neck. After he struck the ground with blood streaming from his mouth and nose, prison officials carried Robinson to the top of the gallows again and, while he was still bleeding, hanged him a second time. The crowd watched as it took Robinson over 30 minutes to die.

16. In 1908, Virginia began using the electric chair to conduct executions. Again, the law required that members of the public attend an electrocution. *See* Jno. Garland Pollard, editor.

*Pollard's Supplement to the Code of Virginia*, Chap 398 of Acts 1908 (As Amended), 857-58 (1910).

17. State legislators favored the electric chair as a means of "eliminating the brutal scenes attending public hangings," according to a March 6, 1908 report by the *Newport News Daily Press*. The legislators believed that the electric chair would be "more humane and in line with progress."

18. In 1962, after 54 years of using the electric chair, Virginia courts imposed a temporary moratorium on executions as the Supreme Court of the United States considered cases challenging the constitutionality of the death penalty. Following the decisions of the Supreme Court in *Furman v. Georgia* and *Gregg v. Georgia*, Virginia amended its capital punishment statutes to comport with the Court's rulings and reinstated the death penalty in 1975. Executions resumed in the Commonwealth in 1982.

19. Virginia's continued use of the electric chair for executions produced brutal scenes that affected public opinion. In 1990, for example, Virginia executed Wilbert Lee Evans by electrocution. The moment the electrical current was activated, Evans lunged forward as blood spurted from his face and drenched his shirt. *The Washington Post* reporters present at the execution reported that "officials in the chamber cringed and looked horrified."

20. In 1995, Virginia began allowing the condemned to choose between lethal injection and electrocution as their means of execution.

21. Since this time, Virginia has executed 82 individuals by lethal injection and 7 individuals by electrocution.

### B. Virginia's Current Execution Protocol

22. Pursuant to Sections 53.1-232 through 53.1-236 of the Code of Virginia, VDOC promulgates an "Execution Manual" which lays out the protocol for carrying out Virginia's executions.

23. The most recent version of the Execution Manual took effect on February 7, 2017. A true and correct copy of the redacted public version of that manual is attached as Exhibit A.

24. The current Execution Manual provides that (1) six citizens, designated "Official Witnesses"; (2) up to four media pool representatives, designated "Media Witnesses"; and (3) an unspecified number of immediate family members of the condemned's victim(s), designated "Victim Witnesses," be permitted, among others, to witness executions from a witness room separated from the execution chamber by a window. Ex. A ¶¶ 2, 4(a)–(c), 7(a)–(c).

25. The Execution Manual requires that, before VDOC escorts a prisoner into the execution chamber, "[t]he curtain to the witness room . . . will be in the closed position." Ex. A. ¶¶ F(4)(c), F(7)(d). Very little sound escapes the execution chamber, preventing individuals in the witness room from discerning what transpires in that chamber while the front curtain is closed.

26. With the front curtain closed, the prisoner is escorted into the execution chamber and strapped to the execution table or the electric chair. *Id.* ¶¶ F(4)(e)–(f), 7(a)–(j).

#### 1. Lethal Injection Executions

27. For lethal injection executions, the front curtain remains closed as members of the VDOC execution team place intravenous lines in the prisoner's arm or "any other locations of the body deemed suitable." *Id.* ¶ F(4)(g). While the front curtain remains closed, the execution team checks the restraints to ensure that they do not impede the IV lines, and starts a saline flow

to verify that the IV lines are open. The front curtain remains closed as members of the IV team attach electrodes from a cardiac monitor to the prisoner and verify that the monitor is functioning. *Id.* ¶ F(4)(g). The front curtain continues to remain closed as the official designated as the executioner retreats behind a back curtain. That curtain remains closed throughout the entirety of the execution while the executioner administers the lethal drugs out of sight of witnesses. *Id.* ¶ F(4)(k-*l*).

28. Only after these steps are completed do prison officials open the front curtain to the execution chamber. This is the first opportunity for witnesses to observe the inmate. Prior to that moment, VDOC prevents witnesses from viewing how the inmate was strapped to the gurney, how the IV lines were placed, how many times execution personnel attempted to place IV lines, how long it took execution personnel to place IV lines, and whether the inmate experienced any pain during these initial procedures.

29. Employing VDOC's three-drug protocol, the execution staff—obscured behind the back curtain—first administer one of three sedatives followed by a saline flush. After a two-minute waiting period during which the execution team performs a noxious stimuli test, the execution director may signal the executioner to inject more sedative. The executioner thereafter administers a paralytic and finally a lethal dose of potassium chloride to stop the condemned's heart.

30. A physician observes the heart monitor and announces the time of death. Immediately after this announcement, the front curtain to the witness room is closed. The back curtain remains closed throughout the procedure.

31. As a result, witnesses are only permitted to view the condemned once strapped to the gurney with IV lines placed, to hear the condemned prisoner's last words through a

microphone turned on only for these words, and to observe the execution drugs after they have been injected and begin to flow through the pre-placed lines that emerge from holes in the back curtain.

32. VDOC's protocol thus deprives witnesses of their right to observe critical stages of Virginia's lethal injection executions. Witnesses cannot determine if VDOC staff encountered any difficulties inserting the IV lines, how many IV lines were attempted, or if the inmate appeared to suffer pain. Nor can witnesses monitor the staff to ensure that they performed the proper checks of the IV lines and the cardiac monitor electrodes. In the event of a botched execution, the public has no way to determine what went wrong or how to prevent mistakes from recurring.

33. These limits on witnesses's ability to view Virginia's executions severely curtail the public's ability to understand how those executions are administered, or to assess whether a particular execution violates either the Constitution or the state's prescribed execution procedures, or is otherwise botched.

### 2. Electrocution Executions

34. For executions by electrocution, the front curtain remains closed as the inmate is escorted into the execution chamber and is strapped to the electric chair. Ex. A ¶¶ 7(a)–(j).

35. VDOC's Execution Manual specifies three actions to be taken while the curtain is drawn, but these actions are unknown to the public because the relevant sections have been redacted from the publicly available version of the Execution Manual. *Id.* ¶¶ 7(g)–(i).

36. When the front curtain is opened, only two steps remain in the execution process. Members of the execution team attach the helmet, mask, and electrodes to the inmate, and the Lead Warden or a designee fits and turns a key to initiate the electrocution. *Id.* ¶¶ 7(j)–(o).

37.     After the sequence of electric shocks, a physician examines the inmate for signs of life.  If the inmate is still alive, prison officials administer another sequence of shocks.  If the physician determines that the inmate is dead, the time of death is announced and the curtain to the witness room is closed.  *Id.* ¶ 7(o).

38.     VDOC's protocol deprives the public of the right to observe multiple stages of Virginia's electrocution executions.  Witnesses cannot determine the initial condition of the inmate, observe the inmate being strapped to the electric chair, or monitor the administration of the three unknown procedures in VDOC's electrocution protocol.  The public cannot determine if the inmate is treated according to the prescribed procedures, or if the procedures violate the Constitution.

### C.  Effect of Virginia's Curtain Provisions

39.     On January 18, 2017, VDOC executed Ricky Gray by lethal injection.  Gray's execution predated VDOC's current Execution Manual.  The manual in force at the time of Gray's execution provided that the curtain to the witness room be closed *after* the condemned entered the execution chamber and reopened for the condemned's final words and the administration of lethal drugs.  As a result, witnesses were able to determine that it took VDOC staff 33 minutes to place IV lines, far longer than the procedure usually takes.  Still, because the version of the Execution Manual then in force required that the placement of IV lines occur behind a closed front curtain, witnesses were unable to evaluate why the procedure took so long, or whether Gray suffered during the process.

40.     This irregularity in the process was a matter of public interest. *The Washington Post* reported that "Ricky Gray's execution took more than 30 minutes. His attorneys want to know why." *Vice Magazine* reported that the execution, Virginia's first under a new drug

protocol, lasted "a half hour longer than expected, raising questions about the controversial drug used in this case and several botched cases of capital punishment." The *Richmond Times-Dispatch* provided a detailed timeline of the execution and reported that "[i]t appeared to take an inordinately long time . . . to place the IV lines and do other procedures behind a curtain that blocked the view of witnesses."

41. On February 7, 2017, just a few weeks after the execution of Ricky Gray and the critical media coverage that followed, VDOC promulgated its current Execution Manual. Revisions to the previous version of the manual further curtailed public access to Virginia's executions by requiring that the front curtain to the execution chamber be closed *before* the condemned is escorted into the execution chamber. Now, witnesses are limited to observing the flow of the lethal drugs after prison officials have already brought the condemned prisoner into the execution chamber, secured him or her to the gurney, and placed the IV lines.

42. On July 6, 2017, VDOC executed William Morva by lethal injection. Consistent with VDOC's current Execution Manual, witnesses were unable to view when or how VDOC's execution team escorted Morva into the execution chamber, strapped him to the gurney, or placed the IV lines. As a result, witnesses were unable to determine how long it took to place the IV lines into Morva's body, whether complications occurred, or whether Morva experienced pain during the process.

## COUNT I

### 42 U.S.C. § 1983—Violation of the First and Fourteenth Amendments

43. A person who, under color of any statute, ordinance, regulation, custom, or usage of any state deprives citizens of their rights, privileges, or immunities secured by the United

11

States Constitution is liable to the injured party in a suit in equity for redress of those rights. 42 U.S.C. § 1983.

44. By promulgating and otherwise enforcing regulations that prohibit the public from witnessing the entirety of Virginia's executions, including the entry of the condemned prisoner into the execution chamber and the placement of IV lines and other procedures to prepare the condemned for execution, Defendant, acting under color of state law, has violated and continues to violate the public's First and Fourteenth Amendment rights to view the entirety of Virginia's executions.

45. The First and Fourteenth Amendments guarantee the public an affirmative and enforceable constitutional right of access to government proceedings for which (a) there is a history of public access to that proceeding and (b) access plays a significant positive role in the functioning of the proceeding. This constitutional access right applies to the entirety of Virginia's execution procedures, from the moment the government initiates the execution process until death, and including all those initial procedures that are an essential part of the execution process.

*The History of Access to the Entirety of Executions*

46. Throughout American history, from the colonial period to the present, there has been a tradition of public access to the entirety of the execution process, from the moment that a prisoner arrives at the execution site to the moments following his or her death. Even as the methods of capital punishment evolved over the centuries, members of the public remained a constant presence at American executions. Witnesses have been able to observe how the noose is tightened around the neck during a hanging; how the electrodes are attached to the body during an electrocution; and how the gas is administered during an execution by lethal gas.

47. Hangings, for example, were conducted using scaffolds that were specifically constructed to accommodate large crowds. *See* Stuart Banner, THE DEATH PENALTY, AN AMERICAN HISTORY 10-11 (2002). The citizens who attended and witnessed such executions often numbered in the thousands. *See* Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 WM. & MARY L. REV. 551, 564 (1994). For example, according to contemporaneous reports, three to four thousand individuals witnessed the hanging of George Robinson in Virginia in 1902.

48. The ceremony surrounding a hanging could take several hours, and the entirety of it was open to the public, from start to finish. *See* Banner, THE DEATH PENALTY, 24. The event began with a procession from the jail to the gallows. *Id.* The time and route of the procession were public knowledge, and a condemned person could expect to see large crowds along the entirety of the route. *Id.* At the gallows, the condemned prisoner typically delivered a speech. *Id.* Then a cap was pulled over the prisoner's face, the rope was adjusted, and the prisoner dropped. *Id.* The whole ceremony was public, outdoors, and conspicuous. *Id.*

49. Even as executions were moved into jails and states switched to more technically complex means of execution—such as the use of the electric chair and poisonous gas— witnesses, including members of the media, were permitted to view the entirety of executions. *See, e.g.*, *Jackson Executed; First in District's New Death Chair*, WASH. POST, May 30, 1928. The nation's very first execution by lethal gas, for example, followed in the tradition of openness from start to finish. Media witnesses were able to observe Gee Jon as he was led from his cell and across the courtyard to the gas chamber, as guards strapped him to a chair, and as the gas inside the chamber was administered. *See Nevada Gas Death Law Held Success*, NEV. ST. J., Feb. 9, 1924.

*The Logic of Access to the Entirety of Executions*

50. The time-honored practice of providing public access to the entirety of executions, including those initial procedures that form an integral part of the execution process, plays a significant positive role in the functioning of executions. Public access aids the proper functioning of the execution process, guards against unconstitutional executions, and enables the public to exercise meaningful democratic control over a state's enforcement of its most consequential power.

51. Public access to the entire execution process guarantees that there is public oversight of a state's exercise of its duty to execute condemned prisoners. Witnesses are able to ensure that execution teams' and state officials' actions comport with a state's execution protocol.

52. Public access to the entirety of an execution ensures that the public learns whether an execution runs afoul of the Eighth Amendment. The improper placement of IV lines, for example, can result in a substantial risk of serious harm in violation of the Eighth Amendment. Observation of the placement of IV lines has enabled the press to inform the public about serious technical and procedural errors in the delivery of lethal compounds to condemned inmates, including errors that have led to serious harm.

53. Public access to the full execution process enables the public to exercise meaningful democratic oversight over executions by ensuring that a state's conduct comports with its constituents' evolving standards of decency and efficacy. Public access to botched or otherwise gruesome hangings led many states to abolish hangings in favor of the electric chair, which was intended to be a more humane means of execution. Public access to botched or otherwise gruesome electrocution executions then led to the adoption of lethal gas as a means of

execution, which was intended to be more humane than the electric chair. Finally, public access to botched or otherwise gruesome lethal gas executions led to the adoption of lethal injection as a means of execution, which is intended to be more humane than previous means. Moreover, public access to executions has contributed to states abolishing the death penalty or otherwise modifying its death penalty protocol in response to constituents' concerns with the financial and penological efficacy of this form of punishment.

54. The history of access to the entirety of executions in this country, the important ways in which access promotes the proper functioning of executions, and the need for access to ensure that state executions adehere to constitutinal constraints all confirm that the public has a qualified First Amendment right to view the entirety of Virginia's executions, including those initial procedures that are an essential part of the execution process.

*The Right of Access to View the Entirety of Executions is Not Overcome*

55. The public's First Amendment right of access to the entirety of executions is not absolute and may be overcome where a state demonstrates that access gives rise to a substantial probability of harm to a compelling and overriding governmental interest; that there are no less restrictive alternatives to closure; and that any closure is both narrowly tailored and effective in protecting the threatened interest.

56. The Commonwealth of Virginia has no compelling governmental interest that overrides the public's right to view the entirety of its executions, including the placement of IV lines in its lethal injection executions and the procedures preceeding its electruction executions.

57. In any event, access does not give rise to a substantial probability of harm to any interest the Commonwealth could identify. VDOC's current Execution Manual, which prevents the public from viewing important parts of the execution process, is not the least restrictive

15

means of protecting any possible governmental interest; nor is the Execution Manual narrowly tailored or effective in protecting any legitimate governmental interest that might exist.

58. As a result of Defendant's actions, Plaintiffs and the public at large have suffered and will continue to suffer injury from the denial of their constitutional right to fully observe the entirety of executions in Virginia. Such acccess is essential to Plaintiffs' ability to provide informed reporting on executions carried out by the Commonwealth.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request:

1. That the Court declare the provisions of the VDOC Execution Manual that bar public access to observe the entirety of the administration of the death penalty, whether by lethal injection or electrocution, to be a violation of access rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States.

2. That the Court enter an order enjoining Defendant and VDOC, including all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with Defendant who receive actual notice of the injunction, from engaging in any act barring the public's ability to observe the totality of an execution, including those initial procedures inextricably intertwined with the execution process, and from obscuring the ability to witness an execution in any way.

3. That the Court award Plaintiffs their costs and attorneys' fees. *See* 42 U.S.C. § 1988; 28 U.S.C. § 2412.

4.       That the Court award such further and other relief as it deems just and proper.

Dated: September 23, 2019                      Respectfully submitted,

By: /s/ _____
Craig T. Merritt (VSB #20281)
cmerritt@cblaw.com
David B. Lacy (VSB #71177)
dlacy@cblaw.com
Gordon M. Phillips (VSB #90982)
gphillips@cblaw.com
CHRISTIAN & BARTON, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112

David A. Schulz, *pro hac vice*
Francesca Procaccini, *pro hac vice*
Charles Crain, *pro hac vice*
MEDIA FREEDOM AND
    INFORMATION ACCESS CLINIC[1]
ABRAMS INSTITUTE
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Fax: (203) 432-3034
Email: dschulz@ballardspahr.com

*Counsel for Plaintiffs*

---

[1] This Complaint has been prepared in part by law students Jeff Guo, Anna Kaul, Sarah Lamsifer, Sara Sampoli, Jacob Schriner-Briggs, and Kelsey Stimson, as well as a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to represent the school's institutional views, if any.