IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BH MEDIA GROUP, INC. d/b/a
RICHMOND TIMES-DISPATCH,
et al.,

     Plaintiffs,

v.                                    Civil Action No. 3:19cv692

HAROLD W. CLARKE, in his
Official capacity as
Director of the Virginia
Department of Corrections,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the RULE 12 MOTION TO DISMISS (ECF No. 18) filed by the Defendant, Harold W. Clarke (the "MOTION"). For the reasons set forth below, the MOTION will be granted.

## BACKGROUND

The Plaintiffs, BH Media Group, Inc. d/b/a Richmond Times-Dispatch, Guardian News and Media LLC, the Associated Press, and Gannett Co., Inc. (collectively the "Media") are news organizations that investigate and report on, inter alia, executions in Virginia. Compl. at 4-5, ECF No. 1. The Media,

using the procedural vehicle provided by 42 U.S.C. § 1983,[1] brings this action against Defendant Harold W. Clarke ("Defendant"), in his official capacity as Director of the Virginia Department of Corrections ("VDOC"), challenging a provision of the VDOC's so-called "Execution Manual" (the "Manual"), which sets out the procedures used by the VDOC to carry out executions of those lawfully sentenced to death.  The most recent version of the Manual was promulgated on February 7, 2017 and has been used to conduct one execution.[2]  Compl. ¶ 23, ECF No. 1; see generally Va. Dep't of Corrections Operating Procedure, Execution Manual, ECF No. 1-1 (hereinafter the "Manual").

The Manual provides that certain categories of people may witness executions.  These categories are: (1) six citizens; (2) up to four media representatives; and (3) three of the victim's family members.  Manual § IV.D.4.(a)-(c), ECF No. 1-1.  The Manual also provides detailed protocols and procedures to follow in carrying out executions.  According to the Manual, the preliminary

---

[1] 42 U.S.C. § 1983 affords no substantive rights.  It merely provides a procedural vehicle for suing in federal court for violations of federal rights committed by persons acting under color of state law.  See Amato v. City of Richmond, 875 F. Supp. 1124, 1132 (E.D. Va. 1994) (citing Albright v. Oliver, 114 S. Ct. 807, 811 (1994)).

[2] On July 6, 2017, VDOC executed William Morva for murder by lethal injection pursuant to the protocols in the current Manual.  Compl. ¶¶ 9, 42, ECF No. 1.

steps in the procedure are not open to those who are permitted to witness the execution.  Manual § IV.F, ECF No. 1-1 (detailing the "Execution Procedures").

The one count Complaint alleges a violation of the First Amendment to the United States Constitution and seeks a declaratory judgment and injunctive relief.  Compl. at 11-17, ECF No. 1.  In particular, the Complaint alleges that the Media seeks "to vindicate the public's right, through their representatives and the press, to witness the entirety of executions" conducted by the VDOC as an instrumentality of the Commonwealth of Virginia.  Id. at ¶ 1 (emphasis added).  The Complaint asserts that the "entirety of executions" includes "observation of those initial procedures that are integral to, or inexplicably intertwined with, the execution process."  Id.  (emphasis added).  To understand the Media's claim, it is necessary to understand the initial procedures in the execution process provided for in the Manual.

To begin, the Manual requires that VDOC personnel escort the inmate into the execution chamber.  Manual § Iv.F.4.(e), ECF No. 1-1.  Then, depending on the method of execution, the inmate is strapped to the execution table or into the electric chair.  Manual §§  IV.F.4.(f), IV.F.7.(f), ECF No. 1-1.

## I.    Procedure For Execute By Lethal Injection

For executions by lethal injection, intravenous lines ("IV lines") are then inserted in the inmate's arm (or any other locations of the body deemed suitable), and the IV lines are secured with tape.  Manual § IV.F.4.(g), ECF No. 1-1.  VDOC personnel then check the restraints to ensure that they do not impede flow to the IV lines and start a saline flow to verify that the IV lines are open.  Id.  Electrodes from a cardiac monitor are attached to the inmate, and VDOC personnel verify that the cardiac monitor is functioning.  Id.  The person identified as the VDOC executioner will then move to the rear of the execution chamber and stand behind a curtain.  Id.  During these initial procedures, a curtain is drawn between the witness area and the execution chamber.  Id. § IV.F.4.(c).

After those initial steps are completed, the prison officials open the curtain to the execution chamber.  Manual § IV.F.4.(j), ECF No. 1-1.  It is at this point that the witnesses are able to view the execution, which consists of several steps.  Id.  First, the VDOC execution staff administers a sedative followed by a saline flush, followed by an appropriate test and further administration of sedatives, followed by the administration of a paralytic drug.  Manual § IV.F.4.(l), ECF No. 1-1.  Then, the administration of a lethal dose of potassium chloride is

4

administered to stop the inmate's heart.   Compl. ¶ 29, ECF No. 1.
A physician observes the heart monitor and announces the time of
death.   Id. ¶ 30.   After this announcement, the curtain to the
witness room is closed.   Id.

In sum, the witnesses, including the Media, witness the
execution from the administration of the drugs until the death of
the prisoner.   The Media, nonetheless, takes the view that the
First Amendment dictates that the Media is entitled access to the
entire execution proceeding, including the ability to witness "how
the inmate was strapped to the gurney, how the IV lines were
placed, how many times execution personnel attempted to place IV
lines, how long it took execution personnel to place IV lines, and
whether the inmate experienced any pain through these initial
procedures."   Compl. ¶ 28, ECF No. 1.

## II.   Procedure For Execution By Electrocution

The Manual also proscribes the procedures for execution by
electrocution.   Manual § IV.F.7, ECF No. 1-1.   After the inmate
is escorted by VDOC personnel into the execution chamber and
strapped into the electric chair, three actions take place.   Id.
Those actions are unknown because the relevant sections of the
Manual are redacted.   Id.[3]   Under the procedures prescribed by the

---

[3] Whatever these three steps may be, the Media seeks access to view
them, but the Complaint makes no point about the fact that the
steps are redacted from the publicly available Manual.

Manual, the curtain between the execution chamber and the viewing chamber is closed while the inmate is escorted into the execution chamber, the inmate is strapped into the electric chair, and the three unidentified actions take place.  Id.

Thereafter, the curtain between the witnesses and the execution chamber is opened.  Manual § IV.F.7.(j), ECF No. 1-1. According to the Complaint, at that point, "only two steps remain in the execution process": the attachment of "the helmet, mask and electrodes to the inmate" and the turning of the key to "initiate the electrocution."  Compl. ¶ 36, ECF No. 1.  The witnesses observe the actual act of execution, including the examination of the inmate by a physician for signs of life and, if the inmate is still alive, the administration of another sequence of shocks. Id. ¶¶ 36-37.

Here too the Media complains that the Manual "deprives the public of the right to observe multiple stages of Virginia's electrocution executions."  Compl. ¶ 38, ECF No. 1.  In particular, the Complaint alleges that:

> Witnesses cannot determine the initial condition of the inmate, observe the inmate being strapped to the electric chair, or monitor the administration of the three unknown procedures in VDOC's electrocution protocol.  The public cannot determine if the inmate is treated according to the prescribed procedures, or if the procedures violate the Constitution.

6

Id.

**III. The Requested Relief and The Reasons Said To Necessitate It**

In the prayer for relief, the Media asks for a declaration that "the provisions of the VDOC Execution Manual that bar public access to observe the entirety of the administration of the death penalty, whether by lethal injection or electrocution, to be a violation of access rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States." Compl. at 16, ECF No. 1. The prayer for relief also seeks an order enjoining the Defendant and VDOC "from engaging in any act barring the public's ability to observe the totality of an execution, including those initial procedures inextricably intertwined with the execution process, and from obscuring the ability to witness an execution in any way." Id.

A reading of the Complaint discloses why the Media takes the view that the public, and hence the press, should be able to view the "entirety of the execution." Specifically, it is said that:

> In the event of a botched execution, the public has no way to determine what went wrong or how to prevent mistakes from recurring.

Compl. ¶ 32, ECF No. 1. It is then said that the limits set by the Manual:

> severely curtail the public's ability to understand how those executions are administered, or to assess whether a particular execution violates either the

7

> Constitution  or  the  state's  prescribed
> execution procedures, or is otherwise botched.

Id. ¶ 33.


## DISCUSSION

The First Amendment right alleged as the basis for this action is the alleged right of access to view the steps that precede the actual execution.   Because the Manual and its implementation by the VDOC forecloses that access, the Media asserts that VDOC is violating the First Amendment right of the public, as made applicable to the states through the Fourteenth Amendment, to have access to the entirety of the execution process.   Compl. ¶¶ 43-45, ECF No. 1.

## I.   The Asserted Grounds for Dismissal

The MOTION straightforwardly, and in terse text, asserts that dismissal is sought under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6).   ECF No. 18.   Then, the MOTION incorporates the supporting memorandum (ECF No. 19) to explain why dismissal is appropriate.   Id.   However, the supporting memorandum is confusing because, although it sets out the standards for the application of Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6), the remainder of the memorandum melds principles underlying the application of both rules so that it is difficult to analyze the arguments presented in the body of the supporting memorandum.

8

Considering the text and structure of the supporting memorandum, as informed by the Media's response memorandum, it appears that the Defendant is making three arguments that, in his view, warrant dismissal of the Complaint: (1) lack of subject matter jurisdiction because the Complaint fails to plead a First Amendment claim; (2) failure to state a cognizable First Amendment claim under applicable law; and (3) failure to state a claim because the asserted claim is barred by the statute of limitations. Each of the Defendant's arguments will be addressed in turn.

## II.   Subject Matter Jurisdiction

First, as the Defendant correctly states, federal courts are courts of limited jurisdiction; and, when a court lacks subject matter jurisdiction over an action, it must be dismissed. MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 10, ECF No. 19.  A motion for dismissal for want of jurisdiction is properly considered under Fed. R. Civ. P. 12(b)(1).  And, when subject matter jurisdiction is challenged, the burden rests with the plaintiff, the party asserting jurisdiction, to prove that federal jurisdiction is proper.  See, e.g., Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995) (citing 2A James W. Moore, Moore's Federal Practice ¶ 12.07, at 12-49, 12-50 (2d ed. 1994)); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

9

Whether subject matter jurisdiction exists is measured in the first instance by reference to the assertions in the Complaint. See Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 808 (1986) ("Under our longstanding interpretation of the current statutory scheme, the question whether a claim 'arises under' federal law must be determined by reference to the 'well-pleaded complaint.'" (citations omitted)).   The Complaint clearly asserts that the action is predicated on federal question jurisdiction under 28 U.S.C. § 1331.[4]  And, an examination of the text of the Complaint makes it quite clear that it seeks redress for violation of an asserted federal constitutional right.   Thus, on its face, the Complaint is sufficient to posit federal subject matter jurisdiction.

Nonetheless, as discussed in the introduction section of his supporting memorandum,[5] the Defendant asserts that the Media's claim is one based only in state law:

---

[4] The Media also asserts that the action is brought pursuant to 28 U.S.C. § 1343(a)(3).  Under that statute, federal district courts have jurisdiction over a civil action "authorized by law" claiming a deprivation, under color of state law, of rights "'secured by the Constitution of the United States or any Act of Congress providing for equal rights,' . . ." See Houston Welfare Rights Org. v. Young, 441 U.S. 600, 600 (1979) (citing 28 U.S.C. § 1343(a)(3)).

[5] MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 1-2, ECF No. 19.

> Because there is <u>no First Amendment right to witness an execution</u>, the claims presented here are—at most—that the Virginia Department of Corrections is <u>not fully complying with a state statute</u> allowing a limited number of individuals, admitted at the discretion of the Director of the Department, to be 'present' during an execution.  Resolution of this issue <u>presents a pure question of state law that does not arise under the Federal Constitution and is therefore not properly before the Court</u>.

MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 1, ECF No. 19 (emphasis added).    Then,  in  presenting  the  argument,  the  memorandum  in support of the MOTION recites as follows:

> The Complaint suffers from a fatal analytical flaw: There is <u>no First Amendment right to witness</u> an execution.  And there is <u>no other federal constitutional provision</u> that <u>could serve as a source of any 'right'</u> to compel greater access to a procedure that, in the Commonwealth of Virginia, has been closed to the public for over a century and a half. Absent a constitutional violation, 42 U.S.C. § 1983 is not implicated, and <u>this Court lacks subject matter jurisdiction to adjudicate what is, at the very most, a state-law policy dispute</u>.

<u>Id.</u> at 10 (emphasis added).  The Defendant's brief goes on to fully explain the assertion that there is no cognizable federal right implicated in the Complaint.  <u>Id.</u> at 12-22.  And that, according to the Defendant, necessitates dismissal of the action for lack of subject matter jurisdiction because (at best) the Complaint presents a question of state law.  <u>Id.</u>

11

This argument, of course, puts the cart before the horse. Under the Defendant's theory of subject matter jurisdiction, the Court is required to first decide whether the Complaint states a legally sufficient claim, and, if not, the Court is to dismiss the action for lack of subject matter jurisdiction. That analytical framework is not correct because it is settled that, "where the complaint, . . . is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, . . . must entertain the suit." Bell v. Hood, 327 U.S. 678, 681-82 (1946). It is equally well-settled that the "failure to state a proper cause of action calls for a judgment on the merits and not for dismissal for want of jurisdiction." Id. at 682. Accordingly, "where a complaint raises allegations which may or may not state a federal claim, a district court should take jurisdiction to decide the merits of the controversy so long as the questions raised are not frivolous on their face." Donohoe Constr. Co. v. Montgomery Cty. Council, 567 F.2d 603, 607 (4th Cir. 1977).

The claim in the Complaint may lack merit, but it certainly is not frivolous.[6]   And, the Complaint clearly seeks redress for

---

[6] The Defendant does not contend that the questions raised are frivolous on their face. And, indeed, they are not, given that the Plaintiffs have cited decisions (albeit from other circuits) that support their position.

the violation of a federal constitutional right, namely a perceived right of access said to be grounded in the First Amendment. Accordingly, federal question jurisdiction exists.  Therefore, the MOTION to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) will be denied.

## III. Motion To Dismiss Under Rule 12(b)(6)

### A.    Whether The MOTION Seeks Dismissal Under Rule 12(b)(6)

In Section II of his memorandum, the Defendant begins by discussing the standard of review that governs analysis of a motion to dismiss under Rule 12(b)(6).  MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 11, ECF No. 19.  Then, in the concluding paragraph of Section II, the Defendant argues, in two sentences, for dismissal of the claim as barred by the statute of limitations defense that is pled as the Defendant's Eleventh Defense. Id. (referencing ANSWER AND AFFIRMATIVE DEFENSES at 13, ECF No. 24).

In Section III of his supporting memorandum, the Defendant goes on to set forth an extensive argument about why the First Amendment does not provide the right of access that is asserted in the Complaint.  MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 12-22, ECF No. 19.  As explained above, that argument is presented as part of the Defendant's attack on subject matter jurisdiction, but, the argument also can be construed as an independent basis for a Rule 12(b)(6) motion.  And, indeed, the Media seems to

13

construe the argument in that way because, in the response memorandum, the Media actually addresses the substantive issue of whether a legally cognizable First Amendment claim exists. PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 11-16, ECF No. 20. Thus, it is necessary to address the Rule 12(b)(6) argument asserting that Count I does not state a cognizable claim under the First Amendment.

## B.    The Applicable Standard

When considering motions to dismiss under Rule 12(b)(6), courts "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018). To survive a motion to dismiss under Rule 12(b)(6), a complaint must set forth "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is 'plausible on its face,' if a plaintiff can demonstrate more than a 'sheer possibility that a defendant has acted unlawfully.'" Id. (quoting Iqbal, 556 U.S. at 678). However, courts do not "'accept as true a legal conclusion couched as a factual allegation.'" SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015) (quoting United States v. Triple Canopy, Inc., 775 F.3d 628, 632 n.1 (4th Cir. 2015)).

14

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.  In addition, the Court may grant a motion to dismiss on the basis of a dispositive issue of law.  Neitzke v. Williams, 490 U.S. 319, 326 (1989).

## C.  Analysis Of The First Amendment Right Asserted

The Constitution does not explicitly provide for the right of press access to execution proceedings, or, for that matter, a right of access to anything.  The right of access that is asserted in this case is predicated on decisional law that establishes, and that governs, the right of access to proceedings in criminal adjudications in court.  It is thus necessary briefly to reflect upon those decisions.

The analysis begins with the understanding that the First Amendment's protection of freedom of the press has traditionally focused on the right of the press to publish information without government restraint, rather than on the acquisition of the information in the first place.  Zemel v. Rusk, 381 U.S. 1, 16-17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").[7]  And, the Supreme

---

[7] In fact, the Supreme Court has held that there is "no constitutional right to have access to particular government information, or to require openness from the bureaucracy." Houchins v. KQED, Inc., 438 U.S. 1, 14 (1978) (plurality opinion). The Supreme Court further opined that the legislature has the power

15

Court has held that "the Constitution does not, . . require [the] government to accord the press special access to information not shared by members of the public generally." Pell v. Procunier, 417 U.S. 817, 834 (1974).

However, the Supreme Court has developed governing principles for determining whether there is public, and hence media, access to proceedings in criminal cases. In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980) ("Richmond Newspapers"), the district court had closed the trial of a criminal case because, in a previous trial of the case, a non-party, non-witness attendee at the trial had passed information about trial testimony to witnesses, resulting in a mistrial. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 560-62 (1980). The defendant moved for closure as a prophylactic measure and the prosecution agreed. Id. The newspapers objected. Id. The Supreme Court of Virginia declined to act on the newspapers' petition for writ of mandamus. Id. at 562. The Supreme Court of the United States took the case for review in part because of the importance of the issue Id. at 563-64.

The Supreme Court reversed the closure order. Richmond Newspapers, 448 U.S. at 581. In so doing, the Supreme Court held

---

to determine what government-held information should be made public. Id. at 12-15.

that the First Amendment implicitly guarantees the press a right of access to criminal trials.   Id. at 574 (concluding that a "presumption of openness inheres in the very nature of a criminal trial under our system of justice").[8]  To reach that result, the Supreme Court examined the history of public access to criminal trials, both at common law and in the United States, and the role that public access played in fostering respect for the judicial system and in securing fair trials.   Id. at 568-70.

Four years later in Press-Enterprise v. Superior Court of California, 464 U.S. 501 (1984) ("Press-Enterprise I"), the Supreme Court used the same analytical approach in concluding that the First Amendment guaranteed public, and hence press, access to the jury selection part of a criminal trial.  Press-Enterprise I, 464 U.S. at 505-10.  And, in 1986, the Supreme Court followed the same approach in finding that the First Amendment guaranteed public, and hence press, access to preliminary hearings in criminal cases.   Press-Enterprise Co. v. Super. Ct. of Cal., 478 U.S. 1, 10-15 (1986) ("Press-Enterprise II").

In 1987, the United States Court of Appeals for the Fourth Circuit relied on the Supreme Court's decisions in Press-

---

[8] See also Globe Newspaper v. Super. Ct., 457 U.S. 596, 606 (1982) ("[T]he right of access to criminal trials plays a particularly significant role in the function of the judicial process and the government as a whole.").

Enterprise I and Press-Enterprise II to conclude that the First Amendment guarantees public, and hence press, access to plea hearings and sentencings in criminal cases, as well as to documents filed in connection with those aspects of criminal cases. In re Washington Post Co., 807 F.2d 383, 388-90 (4th Cir. 1986). The analytical approach taken in Richmond Newspapers, Press-Enterprise I, Press-Enterprise II, and In re Washington Post Co. ("Washington Post") to determine whether the First Amendment affords public, and hence press, access to various parts of criminal cases has come to be known as "the history and logic test," but it would be more properly called the "history, and purpose served by, test."

Relying on Richmond Newspapers, Press Enterprise-I, Press Enterprise-II, and Washington Post, the Media argues that the "history and logic" test affords the public, and hence the press, a qualified right of access to view the entirety of executions, including the initial procedures. PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 11-16, ECF No. 20. Neither the Supreme Court nor the Fourth Circuit have applied the history and logic test outside the criminal adjudication process. Accordingly, the Media makes two arguments in recognition of that fact, to support application of the history and logic test to afford the First Amendment right of access urged here.

18

### 1.   Whether The History And Logic Test Applies Outside Of The Criminal Adjudication Process

First, the Media argues that other courts of appeals have applied the history and logic test to find a First Amendment right of access to a variety of government proceedings.  PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 5-6, ECF No. 20.  For example, the Second Circuit applied the test to allow access to administrative proceedings before a transit board in New York Civil Liberties Union v. N.Y.C. Transit Authority, 684 F.3d 286, 300 (2d Cir. 2012).  The Ninth Circuit applied the test to determine whether a photojournalist had the right to view horse roundups. Leigh v. Salazar, 677 F.3d 892, 899-900 (9th Cir. 2012).  The Sixth Circuit made general statements about the test in Detroit Free Press v. Ashcroft, 303 F.3d 681, 696 (6th Cir. 2002).  The Third Circuit has taken the view that the history and logic test is "broadly applicable to issues of access to government proceedings."  N.J. Media Grp., Inc. v. Ashcroft, 308 F.3d 198, 208-09 (3d Cir. 2002);  PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 4-6, ECF No. 20 (listing cases).

The Media also suggests that the Fourth Circuit's decision in Washington Post has tacitly approved application of the history and logic test to government proceedings.  PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 7, ECF No. 20.  In support

19

of that view, the Media cites the following passage from <u>Washington</u>

<u>Post</u>:

> In deciding whether the First Amendment right
> of access extends to a <u>particular kind of</u>
> <u>hearing</u>, both the Supreme Court and the courts
> of appeals have looked to two factors:
> historical tradition and the function of
> public access in serving important public
> purposes.   In the first inquiry, the court
> asks whether <u>the type of proceeding</u> at issue
> has traditionally been conducted in an open
> fashion. In the second inquiry, the court asks
> whether public access to <u>the proceeding</u> would
> tend to operate as a curb on prosecutorial or
> judicial misconduct and would further the
> public's interest in understanding the
> criminal justice system.

<u>Washington Post</u>, 807 F.2d at 389 (citations omitted) (emphasis

added).   It is correct that, in reaching its decision, the Fourth

Circuit framed the issue as whether "the First Amendment right of

access extends to the type of proceeding or materials to which

access is sought."   <u>Id.</u> at 388.   However, in <u>Washington Post</u> the

type of proceedings at issue were plea and sentencing hearings in

a criminal case.   <u>Id.</u>   Thus, <u>Washington Post</u> does not support the

view that the history and logic test applies outside the criminal

adjudication process.

Second, the Media argues for the application of the history

and logic test by relying on two decisions of the United States

Court of Appeals for the Ninth Circuit that apply the history and

logic test to find the First Amendment right of access urged here.

20

Cal. First Amendment Coal. v. Woodford, 299 F.3d 868, 875 (9th Cir. 2002); First Amendment Coal. of Ariz., Inc. v. Ryan, 938 F.3d 1069, 1075 (9th Cir. 2019).   And, the Media cites a decision of the United States District Court for the Middle District of Pennsylvania that adopts the Ninth Circuit's decision.   Phila. Inquirer v. Wetzel, 906 F. Supp. 2d 362, 371 (M.D. Pa. 2012).

Quite clearly, the Ninth Circuit decisions (and the Pennsylvania federal court adopting those decisions) directly support the Media's position.   In each case, Woodford, Ryan and Wetzel, the court proceeds from the premise that the Supreme Court's decisions in Press-Enterprise-I and Press Enterprise-II, affording access in criminal trials, carry over to executions because the Supreme Court recognizes a qualified right of access to gather information from inmates and to observe some prison conditions.   Woodford, 299 F.3d at 874.   Woodford reached that conclusion by relying on Pell v. Procunier.[9]   Id. at 874.   However, Pell actually upheld certain prison rules that restricted prison access against a First Amendment attack.   Pell v. Procunier, 417 U.S. 814, 834-35 (1974).   And, more importantly, Pell played no role in framing the analysis in Richmond Newspapers, Press Enterprise-I, or Press Enterprise-II, all of which were decided after Pell.   In fact, Pell was not even mentioned in the majority

---

[9] 417 U.S. 817 (1974).

opinions in Press Enterprise-I or Press Enterprise-II.  And, the Richmond Newspapers Court only mentions Pell in passing as "distinguishable" from the facts presented before that court.  448 U.S. at 576.

It is quite a reach to use Pell to say that Richmond Newspapers, Press Enterprise-I and Press Enterprise-II, all of which addressed access in the criminal adjudication process before judgment, dictate public, and hence press, access to executions, which do not occur in the adjudicatory process.  If that chasm is to be breached, the Supreme Court must be the court to make the leap.  Therefore, the Court declines the invitation to follow Woodford, Ryan, and Wetzel.

### 2.    Whether An Execution Is Part Of The Criminal Adjudication Process

The Media next contends, relying on Washington Post, that, even if the history and logic test cannot be applied outside of the criminal adjudication process, "Defendant's effort to limit the public access right solely to criminal proceedings would not be dispositive . . . because executions are part of the criminal justice system."  PLS.' BR. IN OPP. TO DEF.'S MOT. TO DISMISS THE COMPL. at 7, ECF No. 20 (emphasis added).  The Media also argues that the "Fourth Circuit has already held that the access rights extend to proceedings that are 'an integral part of a criminal prosecution'" and that "carrying out a death sentence is just as

22

integral a part of a criminal prosecution . . ." Id. (quoting Washington Post, 807 F.2d at 389). Essentially, the Media argues that the history and logic test should be used to determine whether there is a right of access to executions because executions are part of the criminal adjudication process.

However, this argument misapprehends the holding in Washington Post, which addressed preliminary parts of the criminal adjudication process: plea hearings and sentencing hearings. 807 F.2d at 388. Those hearings, like preliminary probable-cause hearings, suppression hearings, and bail hearings are all stages of the criminal adjudication process that occur in a courtroom before the entry of a judgment that ends the criminal adjudication process. By asserting that the right of access, which has been extended to proceedings that are integral parts of a criminal prosecution, extends to executions, the Media asserts that Washington Post stands for the proposition that the right of access to criminal proceedings includes a right of access to the penal process that follows entry of a judgment in a criminal case. Nothing in Washington Post provides a rational for extending its holding to post-judgment, out of court proceedings. The Court finds nothing in Washington Post that warrants applying its holding to find that an execution, which occurs after entry of a judgment

23

that ends the criminal adjudication process, is a part of that process.

Moreover, the Media's theory is inconsistent with the Supreme Court's treatment of the Media's right of access when determining the Media's access to prisons, where the implementation of punishment actually occurs. In Houchins v. KQED, Inc., 438 U.S. 1 (1978), the Supreme Court upheld limits on access to penal institutions, even when serious issues relating to inmate welfare existed. Houchins v. KQED, Inc., 438 U.S. 1, 3 (1978) (upholding a denial of press access to investigate conditions of a county jail in the wake of a prisoner's suicide). The decision in Houchins does not support the view that the Supreme Court would extend the public's First Amendment right of access to the penal portion of a criminal defendant's sentence.

### 3. Other Recent Decisions Support The Defendant's Position

The two decisions on which the Defendant relies underscore that the First Amendment does not afford the access sought here. Those decisions are: (1) Oklahoma Observer v. Patton, et al., 73 F. Supp.3d 1318 (W.D. Oklahoma 2014); and (2) Arkansas Times, Inc. v. Norris, No. 5:07CV195, 2008 U.S. Dist. LEXIS 3500 (E.D. Ark. Jan. 7, 2008). In both cases, the district courts considered applications for access to executions in a manner virtually identical to that sought by the Media here.

Turning first to Arkansas Press, the district court granted a motion to dismiss under Rule 12(b)(6). 2008 U.S. Dist. LEXIS 3500, at *2. The district court recounted that the Supreme Court "has never recognized a First Amendment right of access to executions." Id. at *5. Citing Holden v. Minnesota,[10] the Arkansas Press court further explained that attendance at executions is a matter for the legislature, and not courts, to prescribe. Id. Then, citing Richmond Newspapers, the district court explained that the Supreme Court has taken the view that "penal institutions, where public access is generally limited, do not share the long tradition of openness associated with courtrooms, which have long been open to the public at the time the First Amendment was adopted." Id. (citing Richmond Newspapers, 448 U.S. at 577 n.11 (citations omitted)).

The Arkansas Times court found particularly instructive the decision of the Supreme Court in Houchins, wherein a television station sought, but was denied, permission to inspect and photograph a particular area of the county jail in which a detainee had committed suicide, allegedly because of jail conditions. 2008 U.S. Dist. LEXIS 3500, at *6 (citing Houchins, 438 U.S. at 8). In Houchins, the district court entered a preliminary injunction

---

[10] 137 U.S. 483, 491 (1890).

enjoining jail officials from denying the media access to that area, and the Ninth Circuit affirmed. Houchins, 438 U.S. at 6-7. However, the Supreme Court reversed, finding that "neither the First nor Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. . . . [and] the media [has] no special right of access to [prisons] different from or greater than that afforded to the general public." Arkansas Times, 2008 U.S. Dist. LEXIS 3500, at *7 (citing Houchins, 438 U.S. at 15-16). In so holding, the Supreme Court acknowledged that prison conditions are matters of public importance but held that access to penal institutions is a question of policy for a legislative body. Houchins, 438 U.S. at 12.

As is the case here, the media organization in Arkansas Times also urged the application of the "history and logic" test to find the asserted First Amendment right of access. 2008 U.S. Dist. LEXIS 3500, at *9-12. In analyzing that issue, the district court recounted the kinds of hearings and criminal proceedings to which the Supreme Court has extended the right of public, and hence press, access. Id. Those proceedings include criminal trials, plea hearings, suppression hearings, and access to a number of pretrial proceedings and transcripts, but the Supreme Court "has never applied the Richmond Newspapers experience and logic test

beyond the context of judicial proceedings that are a part of the criminal process." Id. at *11. In dismissing the media plaintiff's complaint under Rule 12(b)(6), the Court found that:

> An execution carried out by lethal injunction is the state's designated procedure for carrying out a lawfully imposed death sentence. It bears little resemblance to a criminal judicial proceeding, where public participation plays an indispensable functional role in the process itself, and where public access enables citizens to judge whether our system of criminal justice is fair.

Id. at *14. Ultimately, the district court held that the First Amendment does not require that witnesses be able to observe the entire execution procedure. Id. at *15-16.

In Oklahoma Observer v. Patton, 73 F. Supp. 3d 1318 (W.D. Okla. 2014), the issue addressed by the district court was whether the First Amendment secures unto the public, and hence the press, a right "to view and hear the entire execution process from beginning to end, which [the plaintiffs] describe as the time from when the inmate to be executed enters the execution chamber until he leaves the chamber, dead or alive." Okla. Observer, 73 F. Supp. 3d at 1320 (emphasis added). The court recognized that the process of gathering news or information is "'not without its First Amendment protections.'" Id. at 1323 (quoting Branzburg v. Hayes, 408 U.S. 665, 684 (1972)). But, the court noted that while the

27

First Amendment affords some protection to the process of accessing information, it does not afford the press a special right of access not available to the public generally.   Id. (citing Branzburg, 408 U.S. at 684; Houchins, 483 U.S. at 14-16).

The court, in Oklahoma Observer, concluded that in neither the Press-Enterprise I nor the Press-Enterprise II decisions had the Supreme Court applied the history and logic test outside the criminal adjudication process.   73 F. Supp. 3d at 1324. To the court in Oklahoma Observer, this "strongly suggest[ed] that the [Supreme] Court [of the United States] views the Press-Enterprise exception as applying to the criminal adjudication process rather than to the process of implementing a court's judgment, such as is involved here."   Id. at 1324.   The Oklahoma Observer court also found support for that position in Houchins.   Id.   Having thusly analyzed the issue, the court in Oklahoma Observer concluded that "the   Press-Enterprise   exception   does   not   extend   to   the circumstances existing here [the execution process], which are outside the criminal adjudication process."   Id. at 1325.

The decisions in Arkansas Times and Oklahoma Observer are well-reasoned and sound.   They are both persuasive here.

For all the foregoing reasons, Count I fails to state a claim upon which relief can be granted and, thus, the Defendant's RULE 12 MOTION TO DISMISS (ECF No. 18) will be dismissed for failure to

28

satisfy Rule 12(b)(6).[11]

### D.    Analysis Of The Statute of Limitations Argument

The full text of the last paragraph of Section II of the Defendant's supporting memorandum (ECF No. 19) reads as follows:

> Generally, a Rule 12(b)(6) motion to dismiss 'cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred.' (citation omitted). However, a court may determine the merits of a statute of limitations defense under Rule 12(b)(6) if 'all facts necessary to the affirmative defense clearly appear[] on the face of the complaint.' (citations omitted).

MEM. IN SUPP. OF DEF.'S MOT. TO DISMISS at 11, ECF No. 19 (internal citations omitted). It thus is reasonable to construe the MOTION, to the extent that it invokes Rule 12(b)(6), to raise the issue of whether the Media's claim is time-barred. Given the conclusion that the Media's First Amendment claim fails as a matter of law, it is not necessary to decide the Rule 12(b)(6) statute of limitations argument, nor the rather confusing Rule 12(b)(6) plausibility argument.

---

[11] The only issue raised by this case is whether the VDOC's Manual, and the execution protocol therein, violates the First Amendment of the U.S. Constitution. A conclusion that the Manual does not violate the Constitution does not necessarily lead to the conclusion that the provisions of the Manual are either good or bad policy. See Houchins, 438 U.S. at 13 (""We must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment. To do so is to trivialize constitutional adjudication.").

## CONCLUSION

For the foregoing reasons, the RULE 12 MOTION TO DISMISS (ECF No. 18) will be denied to the extent that it argues a lack of subject matter jurisdiction and granted to the extent that it seeks dismissal under Rule 12(b)(6).

It is so ORDERED.

/s/   *REP*
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: June *10*, 2020

30